**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PAUL GLAT MD, P.C.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **NATIONWIDE MUTUAL INSURANCE** | : | |
| **COMPANY and HARLEYSVILLE** | : | |
| **PREFERRED INSURANCE COMPANY** | : | **NO. 20-5271** |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                                      **March 30, 2021**

This is another of many cases brought by businesses seeking indemnity from their insurers for business interruption losses arising out of government ordered shutdowns in response to the COVID-19 pandemic. Plaintiff Paul Glat MD, P.C. was forced to close or severely limit its plastic surgery medical practice in March 2020 due to the shutdown orders issued by the Governor of Pennsylvania and Secretary of the Pennsylvania Department of Health. As a result, it suffered business losses and sought indemnity from its insurance carriers, Nationwide Mutual Insurance Company and Harleysville Preferred Insurance Company (collectively, "Harleysville"), under its commercial lines policy. Harleysville denied the claims.

Glat then brought this action for breach of contract. It seeks a declaration that Harleysville must cover the business losses resulting from the mandatory closing of the practice pursuant to the shutdown orders. It claims that its losses are covered under the civil authority, business income and extra expenses provisions of the policy. Harleysville argues that Glat has not alleged facts establishing coverage under any of the provisions, and if it did, its claims are barred by the virus exclusion.

We conclude that the alleged facts, accepted as true and from which we draw all reasonable inferences in favor of Glat, establish that Glat's losses are not covered. Even if they were, the virus exclusion bars coverage. Therefore, we shall grant Harleysville's motion to dismiss.

### Factual Background

Paul Glat MD, P.C. owns and operates a plastic surgery practice in Bala Cynwyd, Pennsylvania.[1] Glat exclusively performs elective medical procedures.[2]

On March 19, 2020, in response to the rapidly worsening COVID-19 pandemic, Pennsylvania Governor Tom Wolf ordered the closure of all non-life sustaining businesses.[3] The Pennsylvania Secretary of Health issued a similar order containing a list of businesses considered life-sustaining.[4] The list prohibited elective medical procedures.[5] On March 20, 2020, the Pennsylvania Department of Health issued guidelines prohibiting ambulatory surgical facilities from performing elective surgeries or procedures unless they were life-sustaining measures related to a progressive disease.[6]

As an ambulatory surgical facility performing only elective medical procedures, Glat's practice suffered business losses as a result of each restrictive shutdown order.[7] At that time, Glat was insured by Harleysville.

---

[1] Pl.'s Am. Compl. at ¶ 1 (ECF No. 5).

[2] *Id.* at ¶ 63.

[3] *Id.* at ¶ 62; Pl.'s Am. Compl. Exh. 5.

[4] Pl.'s Am. Compl. at ¶ 63; Pl.'s Am. Compl. Exh. 6 ("Department of Health Order").

[5] Pl.'s Am. Compl. at ¶ 63.

[6] *Id.* at ¶ 64; Pl.'s Am. Compl. Exh. 7.

[7] Pl.'s Am. Compl. at ¶¶ 63, 68.

In March 2019 and March 2020, Harleysville issued a commercial lines policy to Glat providing property, business personal property, business income, extra expenses, civil authority and additional coverages.[8] It is an "all risks" policy.[9]

Glat filed suit in the Pennsylvania Court of Common Pleas for Philadelphia County.[10] Harleysville removed the action to this court and filed a motion to dismiss.[11] In response to the motion, Glat filed an amended complaint on November 12, 2020.[12] Harleysville responded again with the same motion to dismiss.[13]

### Interpreting Insurance Contracts

The interpretation of an insurance contract is a question of law. *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020) (citing *Gallagher v. GEICO Indemnity Company*, 201 A.3d. 131, 137 (Pa. 2013)). A court must interpret the plain language of the insurance contract read in its entirety, giving effect to all its provisions. *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011) (citation omitted); *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 258 (3d Cir. 2019) (quoting *Mut. of Omaha Ins. Co. v. Bosses*, 237 A.2d 218, 220 (Pa. 1968)); *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987) (quoting 13 Appleman, *Insurance Law and Practice,* § 7383 at 34-37 (1976)). The words in the policy are construed by their "natural, plain and

---

[8] *Id.* at ¶¶ 16, 20; Pl.'s Am. Compl. Exh. 1 at PJ-0004, ST-7851-ST-7852, Exh. 2 at PJ-0004 ST-7851-ST-7852 (collectively, "Glat Policy").

[9] Pl.'s Am. Compl. at ¶ 22.

[10] Defs.' Not. of Removal Exh. A (ECF No. 1).

[11] *See* Defs.' Not. of Removal; Defs.' Mot. to Dism. (ECF No. 3).

[12] *See* Pl.'s Am. Compl.

[13] *See* Defs.' Mot. to Dism.

ordinary sense" meaning. *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997) (citing *Easton v. Wash. Cty. Ins. Co.,* 137 A.2d 332, 335 (Pa. 1958)); *Kurach*, 235 A.3d at 1116 (citing *AAA Mid-Atlantic Ins. Co. v. Ryan*, 84 A.3d 626, 633-34 (Pa. 2014)).

When the policy language is ambiguous, the provision is construed in favor of the insured. *Kurach*, 235 A.3d at 1116 (citing *Prudential Prop. & Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1177 (2006)); *Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014) (quoting *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)). The policy is ambiguous where it is reasonably susceptible of more than one construction and meaning. *Kurach*, 235 A.3d at 1116 (quoting *Madison Construction Co. v. Harleysville Mut.l Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)); *Pa. Nat'l*, 106 A.3d at 14 (citing *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 978 (Pa. 2001)). However, policy language may not be construed beyond its plain meaning to create an ambiguity. *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011) (citing *Madison*, 735 A.2d at 106); *Trizechahn Gateway LLC v. Titus,* 976 A.2d 474, 483 (Pa. 2009) (citation omitted). It is not ambiguous merely because the parties disagree about its meaning. *Meyer*, 648 F.3d at 164 (citing *Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881, 885 (Pa. Super. 2000)).

The guiding principle in interpreting an insurance contract is to effectuate the reasonable expectations of the insured. *Reliance Ins. Co. v. Moessner,* 121 F.3d 895, 903 (3d Cir. 1997) (citations omitted); *Safe Auto Ins. Co. v. Berlin,* 991 A.2d 327, 331 (Pa. Super. 2010) (citation omitted). Under Pennsylvania law, in "very limited circumstances," the insured's reasonable expectations may prevail over the clear and unambiguous terms of the contract. *Madison*, 735 A.2d at 109; *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.,* 38 F.3d 1303, 1309 (3d Cir. 1994); *Safe Auto Ins. Co.,* 991 A.2d at 332. The language of

the insurance contract itself serves as the best evidence of the parties' reasonable expectations. *Safe Auto Ins. Co.,* 991 A.2d at 332 (quoting *Allstate Ins. Co. v. McGovern,* No. 07-2486, 2008 WL 2120722, at *2 (E.D. Pa. May 20, 2008)).

The reasonable expectations doctrine was created to protect an insured from an insurer's unilaterally changing the coverage. It requires some affirmative action by the insurer or its agent that changed the coverage the insured purchased. In that instance, the insured's reasonable expectations may override the policy language to protect from deceptive conduct by an insurance company and its agents. *See Madison*, 735 A.2d at 109, n. 8; *see also Rourke v. Penn. Nat. Mut. Cas. Ins. Co.*, 116 A.3d 87, 97 (Pa. Super. 2015). Courts have applied the doctrine, for example, when insureds rely on representations from the insurer that do not accurately represent the contents of the policy issued. *See*, *e.g.*, *Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920, 925 (Pa. 1987); *Pressley v. Travelers Prop. Cas. Corp.*, 817 A.2d 1131, 1141 (Pa. Super. 2003). The insured's reasonable expectations may also prevail over the contract language where a sophisticated, commercial party is insured, but the insurer unilaterally altered the insurance coverage. *See UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 503 (3d Cir. 2004).

The insured has the initial burden of establishing coverage under the policy. *State Farm Fire & Cas. Co. v. Estate of Mehlman,* 589 F.3d 105, 111 (3d Cir. 2009) (citing *Koppers Co. v. Aetna Cas. and Sur. Co.,* 98 F.3d 1440, 1446 (3d Cir. 1996)). Where the insured meets that burden and the insurer relies on a policy exclusion as the basis for denying coverage, the insurer then has the burden of proving that the exclusion applies. *Id.; Wolfe v. Ross*, 115 A.3d 880, 884 (Pa. Super. 2015) (citing *Donegal Mut. Ins. Co. v.*

*Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)). Policy exclusions are strictly construed against the insurer. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206-7 (3d Cir. 2001) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n. 3 (3d Cir. 1998)); *Peters v. Nat'l Interstate Ins. Co.*, 108 A.3d 38, 43 (Pa. Super. 2014) (quoting *Swarner v. Mut. Benefit Grp.*, 72 A.3d 641, 644-45 (Pa. Super. 2013)).

### Analysis

Glat asserts coverage under the civil authority, business income and extra expenses provisions of the policy. Harleysville contends that there is no covered loss under any of the provisions. It also relies on the virus exclusion as a basis for denying coverage. Pointing out that the virus exclusion expressly applies to the civil authority, business income and extra expenses provisions, Harleysville asserts that the exclusion bars coverage.

We first determine whether Glat has met its burden of establishing coverage under the civil authority, business income or extra expenses provisions before considering whether any exclusions apply.

The civil authority provision states in relevant part:

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.[14]

The business income coverage provides in relevant part:

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or

---

[14] Glat Policy at BP 00 03 01 06 § A(5)(i).

6

> damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.[15]

The extra expenses provision states in relevant part:

> We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.[16]

All three coverages share two essential elements. Each is predicated on physical loss of or damage to property. The civil authority provision applies when a civil authority issues an order prohibiting access[17] to the insured's property in response to physical loss of or damage to another's property. The business income provision is triggered when there is a suspension of the insured's operations caused by direct physical loss of or damage to the insured's property. The extra expenses provision covers expenses the insured incurred during the period of restoration after the insured property suffered direct physical loss or damage.

Each depends on the existence of a "covered cause of loss" as defined in the policy. The civil authority coverage applies only when the damage to another's property that instigated the governmental response was caused by a "covered cause of loss."

---

[15] Glat Policy at BP 00 03 01 06 § A(5)(f)(1)(a).

[16] Glat Policy at BP 00 03 01 06 § A(5)(g)(1).

[17] Harleysville argues that the shutdown orders did not prohibit access to the insured property, only limited access to it. Defs.' Mot. to Dism. at 22. The shutdown orders prohibited access to the insured property. It does not matter whether the prohibition was total or partial. Nothing in the policy requires total inaccessibility. The shutdown orders prohibited all elective medical procedures, which comprised all of the procedures performed at Glat's practice. The practice was essentially closed to the public, prohibiting it from conducting its business. Because it is not stated that access need be total or substantially prohibited, the policy language is ambiguous. Accordingly, construing the ambiguity in Glat's favor, we conclude that any restriction of access, total or partial, to the property satisfies the prohibited access element of the civil authority provision.

Similarly, the business income and extra expense coverages apply when operations are suspended as a result of loss or damage caused by a "covered cause of loss."

The parties do not disagree that the shutdown orders were "civil authority actions" within the meaning of the policy. Nor do they dispute that there was a "suspension of operations" as a result of these actions. The dispute is whether Glat must allege physical loss of or damage to property caused by a covered cause of loss. Thus, we start with what constitutes physical loss of or damage to property and then examine the policy definition of a covered cause of loss.

*Loss of or Damage to Property*

The civil authority provision applies when direct physical loss of or damage to another's property results in the government restricting access to the insured property. The business income coverage applies when business losses are caused by direct physical loss of or damage to the insured property.

The issue here is whether the loss or damage must be physical or structural, not merely loss of use. Harleysville contends that, to satisfy the "direct physical loss of or damage to property" requirement, Glat must allege some distinct, demonstrable, physical alteration of the insured property or nearby property.[18] It argues that the policy covers only tangible, physical damage, such as a structural change, or actual contamination that eliminates or destroys the property's utility.[19] Because Glat fails to allege that the property

---

[18] Defs.' Mot. to Dism. at 14-15.

[19] *Id.* at 19-21.

8

was actually contaminated, Harleysville argues, it has not alleged the property sustained direct physical loss or damage within the meaning of the policy.[20]

Glat counters that the policy language is ambiguous because it conflates "loss" and "damage" while treating them as separate concepts.[21] It argues that COVID-19 both physically damaged the property in the form of contamination and caused a physical loss by rendering the property unsafe or uninhabitable.[22] Glat also claims the "COVID-19 Effect," the social anxiety over public health, has impacted the business because patients do not feel comfortable in indoor spaces, causing physical loss or damage to the property.[23]

Property damage is "a distinct, demonstrable, physical alteration of the property." 10A *Couch on Ins.* § 148.46 (3d ed. 1995) (citations omitted). Pure economic losses are intangible and do not constitute property damage. 9A *Couch on Ins.* § 129.7.

Reading the civil authority, business income and extra expenses provisions in the context of the entire policy, we conclude that the language is not ambiguous. The loss or damage must be physical.[24] The civil authority provision specifically refers to "direct

---

[20] *Id.*

[21] Pl.'s Resp. at 6-7 (ECF No. 11).

[22] *Id.* at 7, 10-11.

[23] *Id.* at 11.

[24] This conclusion is consistent with the opinions of numerous courts in Pennsylvania presented with the same issue in the COVID-19 business interruption insurance context. *See, e.g., Whiskey Flats Inc. v. Axis Ins. Co.*, No. 20-3451, 2021 WL 534471, at *3 (E.D. Pa. Feb. 12, 2021); *Fuel Recharge Yourself, Inc. v. Amco Ins. Co.*, No 20-4477, 2021 WL 510170, at *3-4 (E.D. Pa. Feb. 11, 2021); *Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se.*, No. 20-2740, 2021 WL 289547, at *5-9 (E.D. Pa. Jan. 28, 2021); *ATCM Optical, Inc. v. Twin City Fire Ins. Co.*, No. 20-4238, 2021 WL 131282, at *1 (E.D. Pa. Jan. 14, 2021); *Moody v. Hartford Fin. Grp., Inc.*, No. 20-2856, 2021 WL 135897, at *4-10 (E.D. Pa. Jan. 14, 2021); *Independence Rest. Grp. v. Certain Underwriters at Lloyd's, London,* No. 20-2365, 2021 WL 131339, at *5-8 (E.D. Pa. Jan. 14, 2021); *Kessler v. Dentists' Ins. Co.,* No. 20-3376, 2020 WL 7181057, at *5 (E.D. Pa. Dec. 7, 2020); *4431, Inc. v. Cincinnati Ins. Cos.*, No. 20-4396, 2020 WL 7075318, at *12 (E.D. Pa. Dec. 3, 2020); *Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co. of Am.,* No. 20-3342, 2020 WL

*physical* loss of or damage to property." The instigation of the orders prohibiting access must be a physical condition in a nearby property. Loss of utility is not structural or physical. Nor is the mere possibility of the presence of the virus in nearby properties or the public's anxiety about indoor spaces.[25]

The business income and extra expenses provisions cover losses sustained by the suspension of operations during the "period of restoration." This term is given special meaning in the policy. It is defined as ending "when the property . . . should be repaired, rebuilt or replaced."[26] This definition informs that the loss or damage to the property must be physical, affecting the structure of the property. It speaks to the time to "repair, rebuild or replace" the property, terms connoting structure. *See Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) (finding the restoration language "strongly suggest[s] that the damage contemplated by the Policy is physical in nature" under Pennsylvania law). *See also Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 20-3342, 2020 WL 7024287, at *4 (E.D. Pa. Nov. 30, 2020) ("The parties' agreement to measure the period of restoration against the time it takes to repair the premises indicates that they intended the Policy to cover losses for physical damage, and that intent controls the Court's interpretation of the Policy."); *Kessler Dental Assocs., P.C. v. Dentists Ins. Co.*, No. 20-3376, 2020 WL 7181057, at *4 (E.D. Pa. Dec. 7, 2020); *4431,*

---

7024287, at *4 (E.D. Pa. Nov. 30, 2020); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893, at *3 (E.D. Pa. Nov. 6, 2020); *Wilson v. Hartford Cas. Co.*, No. 20-3384, 2020 WL 5820800, at *6-8 (E.D. Pa. Sep. 30, 2020); *Kahn v. Penn. Nat. Mut. Cas. Ins. Co.*, No. 20-781, 2021 WL 422607, at *5-9 (M.D. Pa. Feb. 8, 2021); *1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc.*, No. 20-862, 2021 WL 147139, at *4-7 (W.D. Pa. Jan. 15, 2021).

[25] The policy contains a specific exclusion for "loss of use," discussed *infra* at 14. This exclusion underscores our conclusion that the policy contemplates only physical damage.

[26] Glat Policy at BP 00 03 01 06 § H(9)(a)(2)(a)

*Inc. v. Cincinnati Ins. Cos.*, No. 20-4396, 2020 WL 7075318, at *12 (E.D. Pa. Dec. 3, 2020).

There was no physical loss or damage to Glat's or others' properties alleged in the amended complaint. Thus, because it has not alleged facts showing "a direct physical loss of or damage to" its own or others' properties, Glat has not established coverage under the civil authority, business income or extra expenses provisions.

*Covered Cause of Loss*

As in typical "all risks" policies, the policy here defines a covered cause of loss as "risks of direct physical loss" unless the loss is excluded or limited.[27] Glat argues that the shutdown orders are a covered cause of loss that caused its business losses.[28]

The shutdown orders are not a covered cause of loss under the civil authority, business income or extra expenses provisions. The shutdown orders and accompanying proclamations were in response to the COVID-19 health crisis, not to physical loss of or damage to any property – Glat's or another's. *See, e.g.,* "Proclamation of Disaster Emergency," Governor Wolf, Commonwealth of Pennsylvania (March 6, 2020) (stating that it is critical "to implement measures to mitigate the spread of COVID-19");[29] "Order of the Secretary of the Pennsylvania Department of Health Regarding the Closure of All Businesses That Are Not Life Sustaining," Rachel Levine, Secretary of Health, Pennsylvania Department of Health ("To protect the public from the spread of Coronavirus

---

[27] Glat Policy at BP 00 03 01 06 § A(3).

[28] Pl.'s Am. Compl. at ¶ 72. Glat also alleges two other covered causes of loss – the COVID-19 pandemic and the "COVID-19 Effect." *Id.* at ¶¶ 49, 56, 102. As we shall see, losses due to both causes are excluded under the policy. *See infra* at 14-19.

[29] Pl.'s Am. Compl. Exh. 4.

(COVID-19), it is necessary that no person or entity shall operate a place of business that is not a life sustaining business").[30] Glat asserts as much in its amended complaint.[31] The civil authority action cannot be both the cause of loss or damage and the response to it. Therefore, because the shutdown orders are not a covered cause of loss and because the civil authority, business income and extra expenses provisions require a covered cause of loss, the shutdown orders do not trigger coverage under any of the three provisions.

*Exclusions to Property Coverage*

Harleysville raises two exclusions to property coverage that apply to the civil authority, business income and extra expenses provisions. One concerns loss or damage caused by the "acts or decisions" of others: "We will not pay for loss or damage caused by or resulting from . . . [a]cts or decisions, including the failure to act or decide, of any person, group, organization or governmental body."[32] The other excludes "consequential losses": "We will not pay for loss or damage caused by or resulting from . . . Delay, loss of use or loss of market."[33] Glat did not respond to either argument.

The unequivocal language of these exclusions makes it clear that Harleysville will not pay for any loss or damage caused by a governmental act or decision, nor will it pay

---

[30] Department of Health Order.

[31] *See* Pl.'s Am. Compl. at ¶¶ 5 ("[A]n order from Pennsylvania Governor Tom Wolf mandating the closure and/or limitation of all non-life sustaining businesses in the Commonwealth *in an effort to protect the public from the global pandemic caused by COVID-19*"), 71 ("The Civil Authority Orders were implemented *to prevent the spread of COVID-19* by prohibiting and/or limiting people from entering the Covered Property") (emphasis added).

[32] Glat Policy at BP 00 03 01 06 § B(3)(b).

[33] Glat Policy at BP 00 03 01 06 § B(2)(b).

for any loss or damage caused by a loss of use. That is what happened here. The shutdown orders were decisions by state and local governments regulating business operations at the insured property.[34]

As a result of the shutdown orders, Glat was unable to use its surgical facility without violating the shutdown orders. Thus, its business losses caused by the decisions of governmental entities preventing the use of the insured property are not covered under the civil authority, business income or extra expenses provisions.

*Virus Exclusion*

Even if Glat had suffered covered losses under any or all of the civil authority, business income and extra expenses provisions, the virus exclusion precludes coverage. The policy contains an exclusion for viruses and other pathogens. The virus exclusion provides "[w]e will not pay for loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease."[35]

Lest there be any ambiguity, the virus exclusion explicitly states that it "applies to all coverage under Section I – Property in all forms and endorsements . . . [including] business income, extra expense or action of civil authority."[36] This reference to civil

---

[34] According to the Pennsylvania State Police, the shutdown orders "can be enforced by local law enforcement as well as state police. *See* "Business Closure Order Enforcement Guidance," Pennsylvania State Police (2020), https://www.psp.pa.gov/Documents/Public%20Documents/Letter%20LEO%20 Community.pdf. Certain provisions under the Crimes Code, including 18 Pa. C.S. § 5101, may be applicable for more serious violations. *Id.* In her order regarding the closure of all non-life sustaining businesses, Secretary of Health Rachel Levine warned businesses that "[e]nforcement actions will be taken against non-life-sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m." Department of Health Order.

[35] Glat Policy at BP 06 01 01 07 § B.

[36] Glat Policy at BP 06 01 01 07 § A.

authority coverage contemplates a civil authority action taken in response to a virus and excludes it from coverage. Similarly, the specific application of the virus exclusion to business income and extra expense coverage shows that the parties had agreed that a suspension of an insured's operations caused by a virus was not covered.

As we observed, the civil authority provision applies only when another's property is damaged by a covered cause of loss. As alleged in the amended complaint, the virus contaminated other properties which caused the civil authorities to issue the orders. If so, the cause of Glat's losses was the virus, which is specifically excluded as a covered cause of loss. Even if the shutdown orders were the cause, they are similarly excluded from the definition of covered cause of loss. Thus, whether the cause of the losses was the shutdown orders or the virus, it was not covered.

The business income and extra expenses provisions require loss of or damage to the insured's property caused by a covered cause of loss. Glat does not claim that the virus contaminated its property. Nor does it allege any damage to its property that caused it to suspend operations. If it did, the virus exclusion would bar coverage.

Glat argues that the virus exclusion is ambiguous because it does not include a specific reference to a pandemic. The 2006 Insurance Services Office ("ISO") filing cited in the amended complaint reveals why insurers sought the virus exclusion. The filing reads:

> While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, *the specter of pandemic* or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.[37]

---

[37] Pl.'s Am. Compl. at ¶ 87; Defs.' Mot. to Dism. Exh. A.

The American Association of Insurance Services ("AAIS") filing in support of the virus exclusion similarly states: "With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended."[38] These filings clearly contemplated a pandemic as a potential source of loss and created the virus exclusion language to foreclose that avenue of recovery.

The lack of a specific reference to a pandemic in the policy does not render the provision ambiguous. *See Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893, at *4 (E.D. Pa. Nov. 6, 2020) ("the virus exclusion unambiguously bars coverage for plaintiff's claims due to COVID-19"); *Toppers*, 2020 WL 7024287, at *3 ("The language is not ambiguous, and it applies to Covid-19, which is caused by a coronavirus that causes physical illness and distress."); *Kessler*, 2020 WL 7181057, at *3; *Wilson v. Hartford Cas. Co.*, No. 20-3384, 2020 WL 5820800, at *7 (E.D. Pa. Sep. 30, 2020). In any event, there is no real distinction between "virus" and "coronavirus pandemic."

*Reasonable Expectations*

Glat argues its reasonable expectations favor coverage. It argues that we must consider the insured's reasonable expectations even if the contract terms are clear and unambiguous.[39] Glat alleges that because it had no bargaining power or opportunity to negotiate the terms of its policy, its reasonable expectations should override the policy

---

[38] Pl.'s Am. Compl. at ¶ 88.

[39] Pl.'s Resp. at 4-5, 24-25.

language.[40] Harleysville responds that the insured's reasonable expectations can prevail over the express terms of the contract only in limited situations not applicable here.[41]

Glat has not alleged that Harleysville deceived it or unilaterally changed the policy. It has not alleged that Harleysville wrote coverage different from what Glat had requested. The policy's civil authority, business income and extra expenses provisions and exclusions are clear and unambiguous. "[M]ere assertions that a party expected coverage will not ordinarily defeat unambiguous policy language excluding coverage." *Matcon Diamond, Inc. v. Penn Nat. Ins. Co.,* 815 A.2d 1109, 1114-15 (Pa. Super. 2003) (citations omitted).[42]

### Regulatory Estoppel

Glat argues that the virus exclusion was first permitted by state insurance departments because the ISO and AAIS made "false" representations "that the adoption of the Virus Exclusion was only meant to 'clarify' that coverage for 'disease-causing agents' has never been in effect, and was never intended to be included, in the property policies."[43] Glat maintains that "[b]y 2006 . . . courts had repeatedly found that property

---

[40] Pl.'s Am. Compl. at ¶ 19.

[41] Defs.' Mot. to Dism. at 8-9.

[42] Other courts in the Third Circuit have concluded that the insured's reasonable expectations do not overcome the clear policy language in similar COVID-19 insurance cases. *See, e.g., Fuel Recharge Yourself,* 2021 WL 510170, at *5 ("In the absence of such allegations here, I must look to the written policy to determine whether Plaintiff's expectations were reasonable. Because I have concluded that the policy provisions at issue unambiguously preclude coverage, I cannot find that Plaintiff's 'reasonable expectations were frustrated.'") (citations omitted); *Frank Van's Auto Tag,* 2021 WL 289547, at *10 ("It is yet unclear whether Frank Van's purchased the Policy with an expectation that it would be covered for losses of the sort it sustained due to the shutdown orders. . . . [T]hat is presently not the case here as far as the Court is yet aware from the pleadings.").

[43] Pl.'s Am. Compl. at ¶¶ 86, 89.

insurance policies covered claims involving disease-causing agents[.]"[44] Glat contends Harleysville, relying on these misrepresentations, "effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged."[45] Without relying on any facts, Glat seeks additional discovery on this issue under a theory of regulatory estoppel.

"[U]nder Pennsylvania's doctrine of regulatory estoppel, an industry that makes representations to a regulatory agency to win agency approval 'will not be heard to assert the opposite position when claims are made by [litigants such as] insured policyholders.'" *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207, 211 (3d Cir. 2010) (quoting *Sunbeam Corp. v. Liberty Mut. Ins. Co.,* 781 A.2d 1189, 1192-93 (Pa. 2001)). To establish regulatory estoppel under Pennsylvania law, the party seeking to invoke it must establish that the opposing party made a statement to a regulatory agency and later adopted a position contrary to the one presented to the regulatory agency. *Simon Wrecking Co. v. AIU Ins. Co.*, 541 F. Supp. 2d 714, 717 (E.D. Pa. 2008).

Even assuming that ISO or AAIS statements can be imputed to Harleysville, Glat has not alleged that Harleysville is now contradicting those statements. On the contrary, its position here is consistent with the ISO's statement. The ISO's filing asserted in relevant part:

> **Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage.** An allegation of property damage may be a point of disagreement in a particular case. . . . While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, **the specter of pandemic or hitherto unorthodox**

---

[44] *Id.* at ¶ 90.

[45] *Id.* at ¶ 93.

> **transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.** In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.[46]

Similarly, the AAIS stated: "This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded."[47]

The ISO and AAIS recognized that not every case alleging loss due to virus or bacteria involves property damage and that a virus exclusion can be helpful in clarifying that a policy does not cover losses stemming from a virus or other disease-causing agent. Even if the statements were fraudulent or misleading, Glat has not identified how Harleysville's position contradicts these earlier statements. *Hussey*, 391 F. App'x at 211 (rejecting regulatory estoppel because the prior statements were not relevant to the contract language at issue and the statements' context showed the defendant's position was consistent with the ISO's representations); *see also Handel*, 2020 WL 6545893, at *5 ("Defendant takes the same position here as the ISO and AAIS did by arguing that the virus exclusion eliminates coverage for any damage or loss as a result of the causes enumerated therein. Since defendant does not take a contradictory position to the one made to regulatory agencies, the doctrine of regulatory estoppel does not apply to this

---

[46] *Id.* at ¶ 87; Defs.' Mot. to Dism. Exh. A.

[47] Pl.'s Am. Compl. at ¶ 88.

action."); *Kessler*, 2020 WL 7181057, at *3. Therefore, Glat has not stated a claim for regulatory estoppel.

## Conclusion

Glat has not stated a claim for coverage under the civil authority, business income or extra expenses provisions. It has not alleged losses caused by a "covered cause of loss." Even if Glat had met its burden of establishing coverage under any or all of these provisions, the virus exclusion precludes coverage. Therefore, we shall grant the motion to dismiss with prejudice.

We shall not grant leave to amend. Glat has already amended its complaint after Harleysville filed a motion to dismiss the initial complaint that raised the same grounds as it does now. The language of the policy is clear. Further amendment would be futile.